Citation Nr: 1744012 
Decision Date: 09/18/17 Archive Date: 10/10/17

DOCKET NO. 12-31 442 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Phoenix, Arizona


THE ISSUES

1. Entitlement to service connection for a kidney disorder.

2. Entitlement to service connection for bilateral hearing loss.

3. Entitlement to service connection for a right hip disorder.

4. Entitlement to service connection for a low back disorder.


ATTORNEY FOR THE BOARD

B. J. Komins, Associate Counsel





INTRODUCTION

The Veteran served on active duty in the U.S. Army from June 1978 to February 1979.

These matters come before the Board of Veterans' Appeals (Board) on appeal from a July 2009 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Phoenix, Arizona.

The Veteran requested a hearing before a Veterans Law Judge in October 2012; however, she withdrew her request in February 2015 correspondence.

The Board remanded these matters to the AOJ in March 2015 for additional development.

The issue of service connection for bilateral hearing loss addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. There is no competent evidence of a current kidney disorder.

2. There is no competent evidence of a current right hip disorder.

3. A low back disorder was not manifest during service and is not attributable to service. Degenerative disc disease (DDD) of the lumbar spine was not manifest within one year of separation of service.

4. The Veteran has normal hearing in the left ear; hearing loss in the right ear was noted at entry and was not aggravated by any aspect of service including exposure to vehicle and weapons noise in training. 
CONCLUSION OF LAW

1. The criteria for service connection for a kidney disorder have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102. 3.303 (2016).

2. The criteria for service connection for a right hip disorder have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112. 1131, 5107 (West 2014; 38 C.F.R. §§ 3.102. 3.303 (2016).

3. A low back disability was not incurred in or aggravated by service and DDD may not be presumed to have incurred therein. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 5103. 5017 (West 2014); 38 C.F.R. § 3.102. 3.159. 3.303, 3.307, 3.309 (2016).

4. Bilateral hearing loss was not incurred in or aggravated by service. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 5103. 5017 (West 2014); 38 C.F.R. § 3.102. 3.159. 3.303, 3.307, 3.309, 3.385 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2016).

VA's duty to notify was satisfied by a December 2008 and February 2009 letter. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). The Veteran's claims decided on appeal has been fully developed and re-adjudicated by an agency of original jurisdiction after notice was provided. 
Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

VA has fulfilled its duty to assist in obtaining identified and available evidence needed to substantiate the Veteran's low back claim. See 38 U.S.C.A. § 5102(a)(1) (West 2014); 38 C.F.R. § 3.159(c) (2016). Service treatment records (STRS), post-service VA treatment records, private treatment records, and lay statements have been associated with the claims file.

VA must provide a medical examination or obtain a medical opinion when necessary to decide a claim. See 38 U.S.C.A. § 5102A(d) (West 2014); 38 C.F.R. § 3.159(c)(4) (2016).

The Veteran was afforded VA examinations addressing the issues on appeal in March 2012, October 2015 and October 2016. The Board finds that an additional medical examination or opinion is not necessary to decide the Veteran's claims. See Barr v. Nicholson, 12 Vet. App. 303, 311 (2007).

The Veteran has not identified any additional relevant evidence, nor does the record otherwise indicate that there is outstanding relevant evidence to obtain. Thus, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to his claim is required for VA to comply with its duty to assist. As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of this case, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other ground, Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

II. Service Connection

Service connection will be granted if it is shown that the Veteran suffers from a disability resulting from personal injury suffered or disease contracted in the line of duty, or for aggravation of a preexisting injury suffered or disease contracted in the line of duty, during active military service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303 (2016). Disorders and diseases diagnosed after discharge will still be service connected if all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2016);
see also Combee v. Brown, 34 F.3d 1039, 1043 (Fed. Cir. 1994). 

In order to establish service connection on a direct basis, the record must contain competent evidence of: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). In the absence of proof of a present disability there can be no valid claim. Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). 

Some chronic diseases may be presumed to have been incurred in service, if they become manifest to a degree of ten percent or more within the applicable presumptive period. 38 U.S.C.A. §§ 1101(3), 1112(a); 38 C.F.R. §§ 3.307(a), 3.309(a) (2016). DDD, as a form of degenerative arthritis, is such a condition. For those listed chronic conditions, a showing of continuity of symptoms affords an alternative route to service connection. 38 C.F.R. § 3.303 (b) (2016). 

Competent medical evidence is evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also include statements conveying sound medical principles found in medical treatises. It also includes statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159(a)(1) (2016). Competent lay evidence is any evidence not requiring that the proponent have specialized education, training, or experience. Lay evidence is competent if it is provided by a person who has knowledge of facts or circumstances and conveys matters that can be observed and described by a lay person. 38 C.F.R. § 3.159(a)(2) (2016). This may include some medical matters, such as describing symptoms or relating a contemporaneous medical diagnosis. Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); Kahana v. Shinseki, 24 Vet.App. 428, 435 (2011). A layperson is generally not capable of opining on matters requiring specialized medical knowledge. See Layno v. Brown, 6 Vet. App. 465, 469-70 (1994). 

In determining whether service connection is warranted for a disability, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the veteran prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107 (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination, the benefit of the doubt is afforded to the claimant.

Analysis

The Veteran contends that during her U.S. Army service as a vehicle operator, she incurred a kidney disorder that continues to the present. Also, the Veteran contends that injuries sustained from extreme exercise during Airborne Training, including jumping off walls and intensive running, led to a present right hip disorder and low back disorder, and that exposure to weapons noise in training caused bilateral hearing loss.

Kidney Disorder

A review of the Veteran's service treatment records (STRs) reveals the Veteran did complain of right flank pain. However, her STRS are silent to specific kidney complaints or treatment, and a clinician advised that the discomfort would subside with improved physical conditioning. The Veteran also indicated that her kidneys presented no problems in her January 1979 separation examination.

An October 1989 periodic examination report from P. Health Center, a private medical provider, noted in a "review of systems" that the Veteran reported that she experienced excessive thirst and polyuria.

A review of the Veteran's VA treatment records shows that she sought treatment for a confused mixture of complaints, including kidney problems and pain. Radiology reports and progress notes from the Phoenix, Arizona Veterans Affairs Medical Center (VAMC) show that he Veteran received urology consultations, x-ray imaging, and pharmaceutical therapy. These records further show that the Veteran reported a history of urinary tract infections and kidney stones. Medical findings as to the kidneys reported that they were unremarkable-without masses of cysts, calculi, normal ureters, and neither hydronephrosis nor hydroureter. Also, February 2008 radiology report provided medical findings of no present kidney disease. In subsequent progress reports, the Veteran indicated that her kidney disorder presented on-going problems. In a health summary report, an examiner opined that the Veteran articulated that "she has bacterial 'issues' all over her body," add that "diphtheria in her body [has caused pain] for the last 20 years." As assessments, several examiners opined that the Veteran might have a scenario that is suggestive of an anatomical or physiological abnormality in her urinary tract. Throughout her VAMC kidney treatment, the Veteran was also afforded urine analyses.

In June 2008, the Veteran was afforded a VA Doppler study of the renal artery. The VA radiologist's medical findings included an impression of no demonstration of hydronephrosis bilaterally. The radiologist also reported a right renal resistive index of .64 at the arcuate, .59 at the interlobar, and .66 at the hilium level; as well as left renal resistive index of .66 at the arcuate, .70 at the at the interlobar, and .62 at the hilium level. No primary diagnostic code was assigned to the medical findings in the Doppler study report. However, a subsequent CT scan of the Veteran's kidneys in 2010 showed the presence of a non-obstructing kidney stone

In October 2009, the Veteran stated in her notice of disagreement that medical evidence of her disorder had been hidden or destroyed by the military to conceal its mishandling of her service. This lay statement also encompassed a right hip disorder and lower back disorder.

In August 2011, the Veteran submitted a letter in which she reported that she had several health issues which entitled her to benefits.

In October 2012, the Veteran submitted a statement. She reported that apparently she never made it to sick bay at Fort Bragg where she served. In pertinent part, she reiterated her accusations of October 2009. She also stated that she continued to have pain "relapses" that "as she ages [are] becoming life-threatening." This lay statement also encompassed a right hip disorder and lower back disorder.

In December 2012, the Veteran's sister submitted a statement, in which she commented upon the Veteran's disorders. She stated that the Veteran reported that she sustained an injury while jump training. She did not specify whether this was an injury to the kidneys, right hip, or low back.

In October 2015, the Veteran was afforded a VA nephrology examination. The examiner reviewed the Veteran's claims file, considered her lay accounts of her medical history, and provided a physical examination. The examiner opined that the Veteran presently had no renal dysfunction; never had urolithiasis; and did not have a history of urinary tract infection. The examiner noted that the Veteran reported that she frequently urinated, but "self-treated" with cranberry juice and lemonade to resolve her symptoms. As impressions, the examiner opined that there was no objective medical evidence of either a present or a chronic kidney disorder upon examination. Moreover, according to the examiner, subjective experiences did not, in and of themselves, warrant a diagnosis.

In October 2016, the Veteran was afforded a VA nephrology examination. The examiner reviewed the Veteran's claims file, considered her lay accounts of her medical history, and provided a physical examination. The examiner noted that the Veteran had had a non-obstructive kidney stone that was diagnosed in 2010. She also relayed the Veteran's narrative of kidney problems. She reported that the Veteran was not taking regular medication to treat her kidneys, also noting that she had no present renal dysfunction-kidney disorder. No present infections, according to the examiner, were present at the time of the examination. While the Veteran reported that her kidneys required intermittent pain management, the examiner opined that the Veteran's kidneys had no functional impact on her ability to work.

The examiner provided normal BUN, Creatinine, and EGFR test results. The examiner opined that it is less likely than not (less than 50 percent probability) that a kidney disorder was incurred in or caused by an in-service injury, event, or illness. The examiner provided a comprehensive rationale for her opinion, noting that the Veteran's STRS are silent as to kidney complaints, that her right side pain reported on August 30, 1978 was reported as due to "deconditioning" with running. Moreover, a 2007 CT scan showed an absence of kidney stones and a 2010 CT scan showed a non-obstructing kidney stone. However, the examiner emphasized that the only objective medical evidence of record of any kidney disorder occurred in 2010, almost 30 years after service with no connection to active service. The examiner provided did not provide and impression or assessment of a present kidney disorder.

In considering the evidence of record under the laws and regulations as set forth above, the Board finds that service connection for the Veteran's kidney disorder is not warranted. The Board notes that the only medical evidence of record diagnosing any kidney disorder occurred in 2010, almost 30 years after her active service. That non-obstructive kidney stone was not present upon VA examinations in October 2015 and October 2016. As noted above, in the absence of a present disability, there can be no service connection. See Brammer, supra.

Even accepting that a 2010 non-obstructing kidney were a present disorder of the kidneys, there is no evidence of any nexus to service, or even a possibility of such. STRS show no complaints or indications of kidney injury or disease, and the Veteran's own statements regarding her history of injury describe traumas to her back and hips, not her kidneys.

To warrant service connection, there must be a disease or injury in service, as well as a connection, or nexus, between such and any current disability. Neither is shown here. At best, there is a bald allegation of service connection. In the absence of evidence, there cannot be even equipoise, and there can be no resolution of doubt. The Veteran still ultimately bears some burden of evidence production. 38 U.S.C.A. § 5107 (a) (West 2014); Cromer, supra.

As there is no evidence to support any finding of a nexus between service and any present kidney disorder, entitlement to the service connection for a kidney disorder is therefore not warranted.

Right Hip Disorder

The Veteran's STRS are silent as to any right hip injury or treatment; however, the Veteran did report in her January 1979 separation examination that she was having some joint problems, although she failed to identify the specific joints that presented problems.

As stated above, the Veteran contends that extreme exercise during active service caused injury to her right hip.

A review of the Veteran's extensive VA treatment records show frequent complaints of right hip discomfort and pain. Progress notes and follow-up records underscore that she frequently sought treatment, consultation, and home treatment advice.

In a December 2008 statement, conveyed via VA FORM 21-4138 Statement in Support of Claim, the Veteran reported that she had been going to physicians repeatedly for hip and back pain-stating in the 1980s

As discussed above, the Veteran's statements and her sister's lay statement also encompassed a right hip disorder, attributable to extreme physical exercise.

In February 2012, the RO made telephonic contact with the Veteran. The contact was memorialized in a Report of General Information-VA Form 21-0820. The RO noted that the Veteran reported that she injured her hips when she tried to carry her pack. The Veteran also reported that she was not seen at a hospital for her hip[s] and never offered any hospital care during active service.

In September 2015, the Veteran underwent x-ray imaging of her right hip. The radiological report provided medical findings of a right hip without fracture, malalignment or avascular necrosis. Moreover, there was no significant hip joint space narrowing and the pelvis and sacroiliac joints were intact. However, the examiner provided a finding of a 6 mm calcification at the right L3-L4 level. This, according to the examiner, might represent phlebolith however it correlated for the possibility of a uterine calculus.

In October 2015, he Veteran was afforded a VA examination focused on her right hip. The examiner reviewed the Veteran's claims file, considered her lay accounts of her medical history, and provided a physical examination. The examiner noted that the Veteran reported that she experienced intermittent pain and numbness, which she stated were attributable to a 1978 in-service injury incurred when she jumped off of a wall. The Veteran, according to the examiner, contended that her right hip injury worsened because of subsequent in-service marching, running, and "pack carrying." The Veteran stated that she treated her right hip at home through application of cold packs. Upon examination, the medical findings of the September 2015 radiology report were largely confirmed. The examiner provided impressions of no current right hip disorder. Furthermore, he opined that it is less likely than not that the claimed right hip disorder was incurred in or caused by service. As a rationale, the examiner opined that the Veteran's STRS are silent as to a right hip injury. Furthermore, he opined, in the absence of a present chronic right hip disorder, no nexus could be established between the claimed disorder and service.

As stated above, the Veteran's STRS are silent concerning treatment, consultation, or complaints related to her right hip. The Veteran did report in her separation examination that she had some joint problems; however, she failed to stipulate which joints presented problems. Furthermore, subsequent examinations of her right hip, including imaging studies, revealed the absence of a right hip disorder. However, as stated above, the Board notes that the Veteran since service made statements indicating that she specifically injured her hips during basic training or Airborne training. She has consistently done so since filing the claims, and her sister has referred to an in-service injury. The Board finds that it is at least as likely as not that the Veteran sustained some physical trauma during training.

However, review of the copious post-service records fails to establish any present right hip disorder. The record of evidence is devoid of any medical findings indicative of a right hip disorder. Therefore, the Board finds that there is no present right hip disorder. In the absence of proof of a present disability there can be no valid claim and hence no entitlement service connection. Brammer, supra.

Low Back Disorder

The Veteran's STRS are silent as to complaints or treatment of a low back disorder. As discussed above, the Veteran reported that she had some unspecified joint problems in her January 1979 separation examination.

A December 1981 medical record from M-H Regional Hospital reported that the Veteran had a diagnosis of low back strain. This record included no diagnostic findings, testing results, nor rationale as to the assignment of the diagnosis. The report provided the name of the Veteran's employer, a major automobile manufacturer, as the subscriber or guarantor for the medical services rendered.

The October 1989 periodic examination report from P. Health Center noted that the Veteran had chronic medical problems of low back pain and scoliosis. The report included no diagnostic findings, testing results, nor rationale as to this finding.

A review of the Veteran's VA treatment records reveals that she availed herself of medical services for back discomfort throughout her long course of treatment for psychiatric disorders. She reported intermittent diurnal pain and occasional nocturnal pain. Progress notes indicate that she sought advice as to home treatment, medication, and imaging services.

In October 2008, the Veteran was afforded VA x-ray imaging of her lumbrosacral spine. The examiner noted that the Veteran reported that she experienced back pain for the past 20 years. The radiologist provided impressions of lumbar vertebral bodies within the range of normal limits in height and width; mild degenerative changes characterized by the presence of small vertebral body marginal osteophytes; and adequately maintained disc spaces. The examiner also opined that the lamina, pedicles, spinous and traverse processes were intact.

In October 2015, the Veteran was afforded a VA thoracolumbar spine examination. The examiner reviewed the Veteran's claims file, considered her lay accounts of her medical history, and provided a physical examination. In large part, the examiner relayed the narrative provided by the Veteran about the onset and course of her low back disorder. The examiner provided an impression of degenerative arthritis of the spine. The examiner conducted a comprehensive battery of diagnostic tests to determine the extent of the Veteran's low back disorder symptomatology.

In October 2016, the Veteran was afforded a VA thoracolumbar spine examination. The examiner reviewed the Veteran's claims file, considered her lay accounts of her medical history, and provided a physical examination. The examiner reported impressions of DDD with left lower extremity radiculopathy. In large part, the examiner relayed the Veteran's narrative about the onset and course of her low back disorder. At this examination, the Veteran added that she has functional loss because of difficulties bending and lifting. The examiner conducted a comprehensive battery of diagnostic tests to determine the extent of the Veteran's DDD symptomatology. The examiner opined that the Veterans present DDD was less likely than not incurred in or caused by the claimed in-service injury, event or illness. As to rationale for this finding, the examiner noted that the Veteran's STRS are silent as to the claimed injury and treatment. He also noted that the Veteran began to complain of low back disorder in the early 2000s, noting that as people age their spinal discs break down or degenerate. Moreover, according to the examiner, it is not possible to establish a nexus to the Veteran's present DDD in the absence of any chronic treatment or complaints until 2008, almost 30 years after the Veteran's separation from service.

The evidence of record makes it clear that the Veteran has a present low back disorder-namely DDD, confirmed through x-ray imaging. However, a Veteran seeking disability benefits must establish not only the existence of a disability, but also an in-service incurrence and a nexus between her service and the disability. See Shedden, supra. With respect to establishing the incurrence of an injury or onset of DDD with continuity of symptoms after service or an etiological relationship of the current low back disorder, the weight of competent and credible evidence is against a finding that the Veteran's low back disorder was incurred in or is attributable to service.

In reaching these conclusions, the Board has carefully considered the Veteran's lay statements and the lay statement of her sister. The Board acknowledges that, as a lay witness, the Veteran is competent to report her medical history and observable symptomatology. See Layno, supra. Nevertheless, determining the potential causes of degenerative disc disease, a disease involving specialized knowledge of orthopedics and the intricacies of the musculoskeletal system is beyond the scope of lay observation. Id. Thus, a determination as to the etiology of the Veteran's low back disorder is not susceptible to either lay or generic opinions and requires highly specialized training. See Jandreau, supra. The Board here notes that there are no exceptions to the Jandreau doctrine. As such the Veteran's lay statements and the lay statement of her sister do not represent competent evidence concerning the etiology of her low back disorder. See 38 C.F.R. § 3.159(a)(1) (2016) ("competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions.")

Moreover, the Board finds that the Veteran's reports of in-service low back and injuries warrant very low probative weight as they are inconsistent with STRS, and findings in post-service treatment records. See Caluza v. Brown, 7 Vet. App. 498, 511 (1995).

Turning to the medical evidence of record, the Board finds that the October 2015 and October 2016 VA examinations are more probative than either the December 1981 medical record from M-H Regional or the October 1989 periodic examination report from P. Health Center. As mentioned above, the VA examiners supported their conclusions with evidence in the record and lengthy analyses of the Veteran's medical status. Whereas, the December 1981 record and the October 1989 periodic examination do not include the slightest scintilla of medical findings or analysis of the Veteran's medical status

In this regard, the Board may favor the opinion of one competent medical professional over that of another as long as an adequate statement of reasons and bases is provided. See Owens v. Brown, 7 Vet. App. 429, 433 (1995). An evaluation of the probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the examiner's knowledge and skill in analyzing the data, and the medical conclusion reached. The credibility and weight to be attached to such opinions are within the province of the Board as adjudicators. Guerrieri v. Brown, 7 Vet. App. 467 (1993).

Greater weight may be placed on one physician's opinion over another depending on factors such as reasoning employed by the physicians and whether or not and the extent to which they reviewed prior clinical records and other evidence. Gabrielson v. Brown, 7 Vet. App. 36 (1994). The probative value of a medical opinion is generally based on the scope of the examination or review, as well as the relative merits of the expert's qualifications and analytical findings, and the probative weight of a medical opinion may be reduced if the examiner fails to explain the basis for an opinion. Sklar v. Brown, 5 Vet. App. 140 (1993).

As set forth above, the VA examiners opined that the Veteran's low back disorder was not caused or aggravated by service. The Board affords these examiners' opinions great probative weight. As mentioned above, the VA examination reports were based upon a comprehensive review of the Veteran's claims file. Moreover, every conclusion reached was supported by evidence of record. For example, when concluding that the Veteran did not identify a low back disorder during service, the VA examiners specifically noted that the Veteran's STRS are silent as to a low back disorder or an injury indicative of it.

In light of the silence in the Veteran's STRS and absence of credible post-service treatment records within one year after service, it may only be concluded that the Veteran did not have characteristic manifestations sufficient to identify the disease entity during service or within one year of separation from service. Furthermore, there is no competent evidence of continuity of symptomatology since separation from service.

In summary, the weight of competent evidence of record does not support that the Veteran's present low back disorder was incurred in service. Furthermore, there is no competent medical opinion that suggests that a medical nexus between the Veteran's low back disorder and active service. Accordingly, the weight of evidence is against a finding that the Veteran's low back disorder is caused by, or otherwise etiologically related to, active service.

In reaching these conclusions, the Board has considered the applicability of the benefit-of-the-doubt doctrine. As the preponderance of evidence is against the Veteran's claim, that doctrine does not apply and the claim must be denied. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 2.102 (2016).

Bilateral Hearing Loss

The Veteran served as a U.S. Army vehicle operator. She contends that she was exposed to high levels of noise from vehicles and small arms training. 

The threshold for normal hearing is from 0 to 20 decibels, and higher threshold levels indicate some degree of hearing loss. Hensley v. Brown, 5 Vet. App. 155, 157 (1993). For the purposes of applying the laws administered by VA, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. 

Service connection can be granted for a hearing loss where the Veteran can establish a nexus between his current hearing loss and a disability or injury he suffered while he was in military service. Godfrey v. Derwinski, 2 Vet. App. 352, 356 (1992). VA regulations do not preclude service connection for a hearing loss which first met VA's definition of disability after service. Hensley, 5 Vet. App. at 159.

Relevant to VA audiological examinations, in addition to dictating objective test results, a VA audiologist must fully describe the functional effects caused by a hearing disability in his or her final report. Martinak v. Nicholson, 21 Vet. App. 447, 455 (2007).

Service treatment records contain the results of audiometric testing at the time of enlistment and at the time of discharge. The puretone thresholds obtained in June 1978 were as follows: 

HERTZ

500
1000
2000
3000
4000
RIGHT
40
65
70
90
90+
LEFT
5
5
5
10
15

Puretone thresholds obtained in January 1979 were as follows:

HERTZ

500
1000
2000
3000
4000
RIGHT
35
20
70
-
80
LEFT
30
20
15
-
20


In March 2008, the Veteran underwent a hearing acuity consultation at a VA outpatient clinic. In a narrative report, the audiologist noted normal hearing in the left ear and profound mixed hearing loss in the right ear. The Veteran reported exposure to vehicle and weapon noise in service and post-service noise exposure without hearing protection while working for a vehicle manufacturer. The clinician noted that the audiometric test data was not incorporated into the report but was attached in another section of the electronic records system. 

In March 2012, the Veteran underwent a VA examination of her hearing acuity. The audiologist noted the Veteran's report of noise exposure in service but that she was provided some hearing protection. The Veteran reported difficulty hearing in crowds and having to turn to the left because she could not hear in the right ear. She also reported a trial of a hearing aid for the left ear but did not like using it. 

On examination, puretone thresholds were as follows: 

Puretone thresholds obtained in January 1979 were as follows:

HERTZ

500
1000
2000
3000
4000
RIGHT
80
80
105+
105+
105+
LEFT
15
15
10
25
10

Speech discrimination score was 96 percent in the left ear and could not be tested in the right ear. The audiologist found that the Veteran currently had normal hearing in the left ear, actually improved since the measurements at the time of discharge. The audiologist found that the severe loss of hearing in the right ear was noted at entry into active service and was not aggravated and in fact appeared to have improved from those measured at entry compared to those at discharge. 

The Board's March 2015 Remand ordered a search of the electronic records to obtain the March 2008 data. In response to the request for an additional search, in correspondence in December 2016, the VA Medical Center that performed the consultation reported that the results were not available. 

The Board finds that the Veteran is competent and credible to report the nature, frequency, and severity of her noise exposure during training activities for nine months of active duty and occupational exposure after service. 

The Board finds that the Veteran does not have a current hearing disability in the left ear. The Board further finds that the severe hearing loss in the right ear was noted at entry into service and was not aggravated by any aspect of service including the noise exposure in training. The Board places greatest probative weight on the testing and opinion by the VA audiologist in 2012 who considered the Veteran's reports, reviewed the testing data in the service records, and evaluated the concurrent test results and found normal hearing in the left ear and no aggravation of the loss of hearing in the right ear during the Veteran's nine months of active service. Therefore, service connection for hearing loss in the left and right ears is not warranted. 

As the preponderance of evidence is against the Veteran's claim, that doctrine does not apply and the claim must be denied. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 2.102 (2016).


ORDER

Service connection for a kidney disorder is denied.

Service connection for a right hip disorder is denied.




 (CONTINUED ON NEXT PAGE)

Service connection for a low back disorder is denied.

Service connection for bilateral hearing loss is denied. 




______________________________________________
J. W. FRANCIS
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs